IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LINDA CANNON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:04cv279 |
| | ) | [W/O] |
| DYNCORP and | ) | |
| REGINA JOHNSON | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER ON MOTION**

This case is before the court on the defendants' Motion for Summary Judgment (Doc.

# 15) filed on 21 March 2005.  Upon consideration of the parties' submissions and

supporting evidentiary materials, the court finds that the motion should be GRANTED with

respect to Cannon's claims arising under federal law, and her claim for invasion of privacy

should be DISMISSED without prejudice.

**I. FACTS AND PROCEDURAL HISTORY**

Linda Cannon ["Cannon"], an African American female, worked for defendant

Dyncorp ["Dyncorp"] for approximately 14 years until her termination, effective on 20

February 2002.  (Doc. # 42, ¶¶ 2, 17, 18).[1]  When she was fired, and for the previous four

years, Cannon worked in Dyncorp's insulation supply warehouse as a "materiel clerk",

primarily responsible for "inputting shipping documents." (Doc. # 42, ¶ 2).  She was a union

_____

[1]Document 42 is a joint stipulation of facts.

member, and her position was "subject to the terms and conditions" of a Collective Bargaining Agreement ["CBA"] between Dyncorp and the International Association of Machinists and Aerospace Workers, AFL-CIO ["IAMAW"].  (Doc. # 42, ¶ 3; Defs'. Ex. 4).

Although Cannon's response to Dyncorp's motion recites a vague history of perceived discriminatory conduct, the events that are before the court in this disparate treatment case began on 29 January 2002, when Cannon checked herself into a hospital with complaints of "abdominal pain, headache, and cramps."   (Doc. # 42, ¶ 6).   Her hospital stay lasted approximately four days (during which time she was scheduled to work).  On 1 February, she was discharged with a note from her treating physician, Connie Richardson ["Dr. Richardson"], which excused her from work until, but not including, 11 February.  (Doc. # 42, ¶¶ 7, 9).

While at the hospital, Cannon tested positive for cocaine, opiates and "benzo." (Defs'. Ex. 9,  p. 3).[2]  On the day of her discharge, when given the opportunity to enter into a drug treatment program with Bradford Health Services ["Bradford"], Cannon declined but said she would enter the program the following Monday, 4 February.  (Doc. # 42, ¶ 7).  She did not go to Bradford, however, and did not attend any inpatient or outpatient drug treatment program while employed with Dyncorp.  (Defs'. Ex. 2, pp. 238-40).

---

[2]Medical records from her hospital stay indicate Cannon told a nurse that "she thinks she may be coming off morphine." (Defs'. Ex. 9, p. 1).  Cannon does not admit that statement.  Her affidavit provides that, before she checked herself into the hospital, she took some pills from a friend for back pain, because she had left her prescription medication at home.  (Doc. # 19, Cannon Aff., ¶ 14).  She does not, however, specify what kind of "pain pills" she took.  *Id.* Moreover, at her deposition and in response to an inquiry regarding the drugs she took "prior" to checking herself into the hospital, Cannon admitted taking nonprescription morphine and cocaine.  (Defs'. Ex. 2, p. 89, l. 11 to p. 90, l. 10).  She then could not identify any additional drugs she had used, referring instead to the hospital lab report.  (Defs'. Ex. 2, p. 90, ll. 11-14; Defs'. Ex. 11, p. 3).

Throughout Cannon's hospitalization and until she brought her doctor's note to her supervisor sometime during the week following her hospital discharge (Defs'. Ex. 2, p. 98, ll. 9-22), it appears that Cannon did not contact her employer or inform Dyncorp of her whereabouts.  In fact, the only inference permitted by the parties' submissions is that the information in Dyncorp's possession concerning Cannon's absence came not from Cannon or a friend or relative but from Dr. Richardson and  Bradford, the drug treatment facility. (Doc. # 42, ¶ 10; Defs'. Ex. 1, ¶ 5; Defs'. Ex. 2, p. 86, ll. 18-22).

Thus, as of and not including 1 February, Dyncorp's awareness of the reason for Cannon's three-day absence arose exclusively from Dr. Richardson's note or excuse and from Bradford's communication with defendant Regina Johnson ["Johnson"],[3] Dyncorp's manager of employee relations, to obtain disability forms necessary to process Cannon into its drug rehabilitation program.  Cannon herself had given no notice or explanation.[4]

---

[3]Johnson left Dyncorp in November 2003.  As manager of employee relations, later manager of human resources, Johnson was in charge of all employee benefits, and she was the drug and alcohol coordinator.  According to Johnson, "[t]he drug and alcohol program was developed in conjunction with the government's requirements that [Dyncorp] have a drug-free workplace an in coordination with the CBA".  Johnson was also authorized to fire Dyncorp employees.  Johnson Dep., pp. 7-8, 12; Doc. # 42, ¶¶ 10, 13.

[4]Dyncorp's policy regarding work absences is a significant issue in this case.  Article 4.6 of the CBA states, in relevant part:

> An employee's seniority shall be considered broken and all rights under this Agreement forfeited . . . when an employee:
>
> 4.6(c) Is absent for three consecutive work days without reporting to the Company during the absence a reason which is sufficient to justify such absence, unless notification to the Company is beyond the employee's control; otherwise, such absence shall be cause for termination.  Compliance with this is not to be construed to mean that excessive absenteeism shall be tolerated.

(Defs'. Ex. 4, p. 19).  Article 5.17 states that "[e]ach employee will report his absence from work prior to the beginning of his shift on the day of absence, or if unable to do so, report his absence as soon as possible after shift starting time.  *Id.* at 26.  "Determination of whether the absence will be authorized or unauthorized will be made by the employee's

When Cannon submitted Dr. Richardson's note, Bradford again contacted Johnson, and advised her that Cannon had ultimately refused treatment (Doc. # 42, ¶¶ 10,13).   At Johnson's request, Bradford provided a letter reciting in detail the circumstances of Cannon's refusal.  (Defs'. Ex. 12).[5]

As required by section 21.8 of the CBA, Dyncorp maintains an "Anti-Drug/Alcohol Misuse Prevention Program", which Johnson administered during the relevant time period. (Doc. # 42, ¶ 15; Defs'. Ex. 4, p. 71; Defs'. Ex. 13).  The program is comprehensive and encompasses testing, treatment and discipline.  (Defs'. Ex. 13).  An employee who tests positive for a controlled substance or provides a "adulterated or substituted specimen" will be relieved of his or her duties "until completing a substance abuse evaluation and/or a rehabilitation program."  (Defs'. Ex. 13, p. 20).[6]  Failure to complete "a prescribed EAP

---

immediate supervisor based on the facts of each case."  *Id.*  Finally, Dyncorp work rule 45 states that the penalty for "unauthorized absences of three consecutive working days" is discharge.  (Defs'. Ex. 5, p. 5).

[5]The letter stated as follows:

> This letter is to inform you that Linda Cannon was seen at Dale Medical Center on January 31st for an alcohol and drug assessment.  She had been admitted into the hospital on January 29th for withdrawal symptoms from morphine.  Due to her combative behavior she was put in restraints.  At the time of the assessment the patient was incoherent and not willing to talk to anyone in the beginning, but later conceded.  Our recommendation was that the patient be admitted into our Inpatient facility in Warrior, Alabama to be followed by completion of our Intensive Outpatient Program and Continuing Care.  The patient was in agreement, but stated that she did not want to go until the following Monday (3 days later).  The patient's social worker persuaded the plaintiff to go inpatient on February 1st.  The driver was on the way to pick up the patient when the patient refused to go to treatment and left the hospital against medical advisement.

(Defs'. Ex. 12).  Cannon does not recall that she agreed to enter into Bradford on 1 February, but the issue is not material. (Defs'. Ex. 2, p. 88, l. 12 to p. 93, l. 8)

[6]Dyncorp's work rule 28 gives the company the option of suspending an employee for five days "in lieu" of referral to a drug treatment program.  (Defs'. Ex. 5, p. 4).

treatment program" or a second positive drug test constitutes grounds for dismissal.  (Defs'. Ex. 13, pp. 20-21).

On 11 February, the date that Dr. Richardson authorized Cannon to return to work, Cannon neither appeared for work nor contacted her supervisor.  (Doc. # 42, ¶ 13;  Doc. # 20, Johnson Dep., p. 166;   Defs'. Ex. 2, pp. 98-101).   One of Cannon's immediate supervisors, John Jones ["Jones"], informed Johnson of Cannon's absence. (Doc. # 19, Johnson Dep., p. 128).[7]  Johnson was unsuccessful in contacting Cannon on 11 February on 12 February, and Cannon did not report for work on either day. (Doc. # 42, ¶ 14).  Johnson then spoke with Cannon's sister, who worked in Johnson's office, and inquired into Cannon's whereabouts.

On the third day of her absence, having heard through her sister and mother that Johnson was looking for her, Cannon called Johnson toward the end of Cannon's scheduled shift.  (Doc. # 42, ¶ 14, 15; Defs'. Ex. 2, p. 101, l. 19 to p. 102, l. 16). She told Johnson that she was under a doctor's care and explained that she would have her doctor, known only to the court as "Dr. Beauchamp", immediately fax a note excusing her absences.  *Id.*  Johnson told Cannon that she would not be permitted to return to work until she had completed the drug treatment recommended by Bradford.  *Id.*  Cannon expressed concern about Bradford

---

[7]Cannon asserts in her affidavit opposing the motion that she had told Jones she would be providing another note excusing her from work for dates following the 10th because she would not be able to return to work on the 11th. (Doc. # 19, Cannon Aff., ¶ 17).  Although Cannon herself provides evidence undercutting this assertion (Doc. # 20, Johnson Dep. Exs., p. 7), the court will accept it as true for this motion. Regardless, as Jones' actions are not in question and Johnson's knowledge is, whether and what Cannon told Jones is not material.  Cannon does not dispute the defendant's assertion that Jones indicated to Johnson that he had no knowledge of Cannon's whereabouts or reason for her absence.  (Defs'. Ex. 1, ¶ 9).

and asked if she could attend treatment elsewhere, to which Johnson replied that she would

check.  (Doc. # 42, ¶ 15).[8]         According to Johnson's caller identification system,

---

[8]According to Cannon's affidavit in opposition to this motion, after speaking with Johnson the first time on 13 February, Cannon's mother connected her, Johnson and Dr. Beauchamp's office on a conference call, during which Dr. Beauchamp's staff informed Johnson that Cannon was in fact under his care and would remain so until 25 February. (Doc. # 19, Cannon Aff., ¶ 19).  This statement, however, directly contradicts Cannon's testimony at her deposition, which describes the conference call as having taken place the *following* day during one of two conversations and only after Johnson told Cannon she was being fired.  (Defs'. Ex. 2, pp. 105-09).  Cannon's testimony regarding her first call to Johnson fails to mention a conference call or a second telephone call on 13 February:

> Q:     When you called [Johnson] the afternoon that you did call her, what did you discuss with her?
>
> A:     She told me I couldn't return to work until I went to an in-house treatment. And she was going to find me a facility, and I was to call her back the next day.
>
> Q:     What did you say in response to that?
>
> A:     She said I could not return to work until I go to an in-house treatment.  I didn't have a choice.  I said okay.
>
> Q.     Did y'all discuss the fact that you had been absent the previous day or two?
>
> A:     I think she did ask me why wasn't I at work or – yeah, something about I didn't have a doctor's excuse.  And I told her I did have a doctor's excuse.  And then . . . I don't know if it was that day or the next day that we discussed getting it faxed.
>
> Q:     Are you saying you had a second conversation with Gina Johnson?
>
> A:     Yes. Yes.
>
> Q:     When was that second conversation?
>
> A:     The following day.

(Defs'. Ex. 2, p. 105, l. 7 to p. 106, l. 7).  In addition, the stipulation of facts discusses only one call on 13 February and one call on 14 February.  (Doc. # 42, ¶¶ 16-17).

Another contradiction arises at this point.  Cannon states in her affidavit that during the first conversation with Johnson, she complained that she was being treated unfairly and being discriminated against.  (Doc. # 19, Cannon Aff., ¶ 19).  Yet, Cannon failed to mention that statement in the exchange quoted *supra* or in any other discussion regarding the first telephone call. (Defs'. Ex. 2, p. 101-06).

Johnson's state of mind as well as Cannon's alleged complaints of discrimination are material to this case.  Clearly, the implications differ dramatically if Johnson decided to terminate Cannon *after* speaking with Dr. Beauchamp, rather than *before* speaking to him, as Cannon states in her affidavit.  The same is true if Johnson's decision immediately

6

Cannon's call originated in California.  (Doc. # 19, Cannon Aff., ¶ 20).  Cannon called Johnson again the next morning, on the fourth day of her absence, to ask whether Johnson had received the excuse from Dr. Beauchamp's office.  (Doc. # 42, ¶ 16).  Johnson denied having received an excuse and confronted Cannon with the fact that she was in California.  (Doc. # 42, ¶ 16; Doc. # 19, Cannon Aff., ¶ 20).  She then informed Cannon that her employment was being terminated for unauthorized absences, job abandonment and failure to complete a prescribed drug treatment program.  (Doc. # 42, ¶ 17).  Cannon again stated that she was under Dr. Beauchamp's care and attempted to assure Johnson that an excuse would be forthcoming.  (Defs'. Ex. 2, p. 106, l. 16 to p. 109, l. 1).[9]

After speaking with Cannon, Johnson prepared and mailed a letter setting forth the reasons for her termination.  (Doc. # 42, ¶ 18; Doc. # 20, Johnson Dep. Exs., p. 8).  The next morning, Johnson read Dr. Beauchamp's letter, which had been faxed to her at 5:00 p.m. on the previous day, excusing Cannon from work from 4-25 February.  (Doc. # 42, ¶ 20).

Cannon then complained to the union, which pursued her cause through arbitration.  (Doc. # 42, ¶¶ 22-24).  The arbitrator ordered Cannon reinstated conditioned upon her ability to pass a drug test "administered and paid for" by Dyncorp by a date certain.  (Doc. # 42, ¶.

---

followed a complaint of discrimination, as Cannon's affidavit suggests.  A party opposing a motion for summary judgment may not rely upon an affidavit asserting facts that directly contradict earlier sworn testimony given in response to unambiguous questions.  *Thomas v. Ala. Council on Human Relations, Inc.*, 248 F. Supp. 2d 1105, 1112-13 (M.D. Ala. 2003) (citing *Van T. Junkins & Assocs., Inc., v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  Consequently, the contradictory statements in Cannon's affidavit are due to be stricken.  *Id.*

[9]Cannon claims to have complained about discrimination after being fired (Doc. # 19, Cannon Aff., ¶ 20), and she also stated that she later put Johnson in touch with Beauchamp's office directly via conference call.  (Defs'. Ex. 2, p. 107, l. 16 to p. 108, l. 19; Doc. # 19, Miles Aff., ¶ 3).  Although the former assertion contradicts Cannon's deposition testimony, *id.*, and the defendants do not stipulate to the latter, neither post-decision event has any bearing on whether Johnson's reasons for terminating her in the first place were discriminatory.

24).  On 24 October, 2002, Cannon submitted to a urinalysis administered by Dyncorp. (Doc. # 42, ¶ 26).  The test result was positive for cocaine.  (Doc. # 42, ¶ 26; Pl's. Exhs. 19, 20).  Upon learning of the result,[10] and on her own initiative, Cannon submitted her own urine sample directly to the lab used by Dyncorp.  (Doc. # 19, Cannon Aff., ¶ 25).  This test returned negative results but indicated that the sample was "dilute".  (Defs'. Ex. 22). Dyncorp refused to accept the second test, and the union declined Cannon's request to file another grievance on her behalf.  (Doc. # 42, ¶ 30).

Cannon timely filed an EEOC charge, but no evidence has been submitted indicating the outcome of the EEOC proceedings.  The defendants do not allege that Cannon has failed to exhaust her administrative remedies; thus, in determining this motion, the court assumes that Cannon exhausted her administrative remedies before filing her federal lawsuit.  Cannon alleges the following violations:

- disparate treatment with respect to her firing pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., and pursuant to 42 U.S.C. 1981;

- retaliation pursuant to Title VII;

- a claim of breach of contract under 29 U.S.C. § 185(a); and

- a state law claim of invasion of privacy.

(Doc. # 1)

---

[10]Cannon learned of the result through her mother, with whom Johnson shared the information over the telephone.  (Doc. # 19, Cannon Aff., ¶ 25; Miles Aff., ¶ 4).

## II. STANDARD OF REVIEW

Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". **FED. R. CIV. P. 56(c)**. A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." ***Green v. Pittsburgh Plate and Glass Co.***, 224 F. Supp. 2d 1348, 1352 (N.D. Ala. 2002) (citing ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986)). "A judge's guide is the same standard necessary to direct a verdict: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law'." *Id*. at 259. "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party.[11]

---

[11]  The Supreme Court explained that:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citations omitted).

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).  Notwithstanding this advantage, the nonmoving party bears the burden of coming forth with sufficient evidence on each element that must be proved.[12]  *Earley v. Champion Intern. Corp*., 907 F.2d 1077, 1080 (11th Cir. 1990); *see Celotex*, 477 U.S. at 322-23.  When faced with a properly supported motion for summary judgment, a plaintiff must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp.*, 477 U.S. at 324. Although the evidence need not be in a form necessary for admission at trial, *id.*, unsupported, self-serving allegations are insufficient to oppose a motion for summary judgment.  *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995); *Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984).

---

[12] "[I]f on any part of the prima facie case there would be insufficient evidence to require submission of the case to a jury, . . . [the court must] grant summary judgment [for the defendant]." *Earley*, 907 F.2d at 1080 (citations omitted).  In *Earley*, the Court of Appeals further emphasized:

> "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.
>
> ***
>
> If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted) (emphasis added); *accord Hudson v. Southern Ductile Casting Corp.*, 849 F.2d 1372, 1376 (11th Cir. 1988).

*Earley*, 907 F.2d at 1080-81.

# III. DISCUSSION

## A.    *Disparate Treatment*

Cannon contends that she was the victim of disparate treatment throughout her employment at Dyncorp, but her evidence is limited to her most recent termination.[13] Cannon contends that by giving her what she perceives as only one day to furnish a doctor's excuse for missing work from 11-14 February, the defendants treated her differently than "numerous" white employees who were given more time before being fired.  (Doc. # 19, Pl's. Br., pp. 21-23; 28-32).

Cannon concedes that she can provide no direct evidence of discrimination.  (Doc. # 19, Pl's. Br., p. 24).  Therefore, in accordance with the burden shifting analysis outlined in ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L. Ed. 2d 668 (1973), to succeed on her wrongful termination claim she must first present a *prima facie* case by establishing facts "adequate to permit an inference of discrimination."  ***Rayborn v. Auburn Univ.***, 350 F. Supp. 2d 954, 960 (M.D. Ala. 2004) (citing ***Holifield v. Reno***, 115 F.3d 1555, 1561-62 (11th Cir. 1997)).[14]  A plaintiff in a disparate treatment case may

---

[13]Cannon had been terminated from Dyncorp on two previous occasions:  first in 1995 for reasons that are not clear and later in 1998 for "multiple rules violations" approximately one week after being suspended for "unauthorized absence".  *Id.*  (Doc. # 19, Cannon Aff., ¶ 5; Doc. # 20, Johnson Dep. Exs., p. 3).  She was reinstated both times, though the only evidence regarding the circumstances of her reinstatements relates only to her latter reinstatement, which appears to have been the result of union grievance procedures.  (Doc. # 20, Johnson Dep. Exs., p. 3).

[14]Title VII and section 1981 claims are analyzed in the same manner.  ***Rolle v. Worth County School Dist.***, 02cv201, 2005 WL 894013, at *1n.4 (11th Cir. 2005) (citing ***Standard v. A.B.E.L. Servs., Inc.***, 161 F.3d 1318, 1330 (11th Cir. 1998)).

establish a *prima facie* case by demonstrating the following:

- She is a member of a protected class;

- She suffered an adverse job action;

- She was qualified for the job; and

- The defendant(s) treated similarly situated employees outside her protected class more favorably.

***Wilson v. B/E Aerospace, Inc.***, 376 F.3d 1079, 1091 (11th Cir. 2004); ***Holifield***, 115 F.3d at 1562.

For the purpose of this motion, the defendants concede that Cannon is a member of a protected class and has suffered an adverse job action. (Doc. # 16, p. 16). They contend, however, that she was not qualified for the position and has failed to present evidence that similarly situated employees outside Cannon's protected class were treated differently. (Doc. # 16, pp. 16-18).

### 1.   Cannon's Qualifications

The defendants argue that, because Cannon was absent without authorization and unable to return to work due to the presence of controlled substances in her system, she failed to meet Dyncorp's bona fide expectations and, thus, was not qualified for her position. (Doc. # 16, p. 16); *see also* ***Contreras v. Suncast Corp.***, 237 F.3d 756, 760-61 (7th Cir. 2001). Whether Cannon actually met Dyncorp's expectations   - or more appropriately, whether Johnson acted on a belief that Cannon was *not* meeting Dyncorp's expectations as opposed

12

to acting out of racial animus -   is not a subject the court will address when determining whether Cannon presents a *prima facie* case. ***Holifield***, 115 F.3d at 1562 n.3. The resolution of that issue is more appropriate as the court determines whether the defendant's stated reasons are pretextual.

Cannon is correct that, for purposes of summary judgment, it is enough that she worked in her position for a significant period of time and otherwise performed her duties "in an acceptable manner".(Doc. # 19, Pl's. Br., p. 27; Doc. # 20, Johnson Dep. Exs., p. 7); *see also* ***Crapp v. City of Miami Beach***, 242 F.3d 1017, 1020 (11th Cir. 2001);   ***Damon v. Fleming Supermarkets of Fla., Inc.***, 196 F.3d 1354, 1360 (11th Cir. 1999).


## 2.      Similarly Situated Employees

As evidence of disparate treatment, Cannon provides the termination letters that Dyncorp sent to five white employees whom she contends Dyncorp treated more favorably in applying company policies regarding absences.  (Doc. # 19, Pl's. Br., pp. 21-23; Doc. # 20, Johnson Dep. Exs. pp. 11, 16, 23-25).  Specifically, Cannon states that the white employees were permitted to miss more days than she was before they were fired and that they were given more time to provide a doctor's excuse. *Id.*

The defendants argue that Cannon's alleged comparators are not "nearly identical", as required by the Eleventh Circuit to establish sufficient similarity. ***Maniccia v. Brown***, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (requiring that the alleged misconduct be "nearly identical").  Cannon responds that "similar" need not be "nearly identical".  ***Anderson v.***

***WBMG-42***, 253 F.3d 561, 565 (11th Cir. 2001).

Although the parties' arguments allude to a recognized inconsistency in Eleventh Circuit precedent, it is not necessary for the court to attempt to resolve the apparent conflict.[15] Even when the court applies the less rigorous standard of similarity Cannon nonetheless failed to provide sufficient evidence upon which a reasonable trier of fact could rely in concluding that the employees with whom Cannon aligns herself are similarly situated. *See*, *e.g.*, ***Keel***, 256 F. Supp. 2d at 1265 (noting that the burden is on the plaintiff to present "affirmative" evidence establishing similarity); ***Jones v. Gerwens***, 874 F.2d 1534, 1541 (11th Cir. 1989) (stating that the burden is on the plaintiff "to show a similarity between [his] conduct and that of white employees who were treated differently and not on [the defendant] to disprove their similarity.").

> In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. The most important factors in the disciplinary context are the nature of the offense committed and the nature of the punishments imposed.

***Silvera***, 244 F.3d at 1259 (internal quotations and citation omitted). The court's inquiry is probing, and a plaintiff may not survive summary judgment simply by pointing to superficial

---

[15]Notably, more recent decisions from the Eleventh Circuit and this court strongly suggest that the defendants' view may be the one more consistent with the state of the law at this time. ***Wilson***, 376 F.3d at 1091 (11th Cir. 2004); ***Silvera v. Orange County School Bd.***, 244 F.3d 1253, 1259 (11th Cir. 2001); ***McCaskill v. ConAgra Foods, Inc.***, 296 F. Supp. 2d 1311, 1317 (M.D. Ala. 2003) (Albritton, C.J.); ***Keel v. U.S. Dep't of Air Force***, 256 F. Supp. 2d 1269, 1286 (M.D. Ala. 2003) (Fuller, J.); ***Davis v. Qualico Misc. Inc.***, 161 F. Supp. 2d 1314 (M.D. Ala. 2001) (Thompson, J.).

similarities; the similarity of the misconduct must be viewed in the light of the circumstances. *See*, *e.g.*, ***Cooper v. So. Co.***, 390 F.3d 695, 741 (11th Cir. 2004) (comparing work history records in a disparate compensation claim); ***Maynard v. Bd. of Regents Div. of Univs. of Fla.***, 342 F.3d 1281, 1289-90 (11th Cir. 2003) (comparing the length of time both the plaintiff and the comparator exhibited similar performance problems as well as the cause of the problems); ***Knight v. Baptist Hosp. of Miami, Inc.***, 330 F.3d 1313, 1318-19 (11th Cir. 2003) (comparing the "number and nature" of the plaintiff's and comparator's "performance and tardiness problems"); ***Anderson v. WBMG-42***, 253 F.3d at 567 (upholding the district court decision to disallow testimony regarding alleged comparator when the evidence was insufficient to determine the supposed similarity); ***Jones***, 874 F.2d at 1541-42 (comparing decision makers); ***Jackson v. Northeastern Illinois Univ.***, 24 Fed. Appx. 590, 593-94, 2001 WL 1530590, at *3 (7th Cir. 2001) (requiring evidence of the circumstances surrounding the plaintiff's and comparator's absences to determine comparability).

The letters that Cannon provided establish only that she and her alleged comparators were employed by the same company and fired for being absent, arguably among other things.  (Doc. # 20, Johnson Dep. Exs., pp. 11, 16, 23, 24, 25).  Although there is some indication that two of the employees missed several more days than Cannon, the evidence does not indicate *exactly* how many scheduled days were missed.  Only one letter indicates whether the employee had contacted her supervisor, as required by article 5.17 of the CBA. *See supra* note 3.  None of the letters discussed the employee's work history, in general, or

as it relates to absenteeism.[16]

Dyncorp's termination letters, including Cannon's own, provide only a skeletal outline of the situation at the time of termination and lack any description of the circumstances of the employee's absences, with two notable exceptions. The letter for R.S., which indicated completion of a rehabilitation program, and for S.P., which mentions "compensation" related to her absence, are more damaging to, than supportive of, Cannon's argument. They not only facially distinguish R.S.'s and S.P.'s situation from Cannon's own, but they also underscore

---

[16]The evidence indicates that Cannon had significant absences. As recently as June 2001, she had been counseled for having an absence rate of 39.8 percent. (Defs'. Ex. 2, pp. 82-83).

Referring only to the employees' initials, the following outline discusses the facts evident in each of the letters:

- D.W. was sent a letter dated 10 December 1999. His termination for violation of Article 4.6 of the CBA, was retroactive, beginning 27 August. Dyncorp had sent a certified letter demanding medical information to document his "current absence from work". Dyncorp received no response from him and nothing from his physician.

- P.D. was sent a letter dated 12 July 2000. Her termination for violation of rule 45 regarding three consecutive unauthorized absences was to be effective 18 July 2000. Her last day of work was 5 July 2000. Dyncorp had no medical documentation to excuse her absence. On her third day absent, Johnson informed her that she needed to come to work, but she did not come in. Johnson again advised her on 11 July that she was not authorized to be out unless she "had something from a doctor stating that [she] was disabled". P.D. then responded that she was coming in to work, but she never checked in, and she did not call her supervisor.

- R.S. was sent a letter dated 8 April 2002. His termination for violation of Article 4.6 of the CBA was to be effective 13 March 2002 "(the day *after completing* your rehabilitation program and could return to work)" (emphasis added). He had not been to work since then. Dyncorp sent R.S. a certified letter demanding that he provide medical documentation by 5 April. Dyncorp received nothing.

- C.B. was sent a letter erroneously dated 31 May 2002. His termination for violation of Article 4.6 of the CBA was to be effective 22 May 2002. He had "been absent since that date and [had] not called [his] supervisor to report [his] absence." Although the letter has a few additional details, they appear to relate to events that took place in April, though obvious errors make it difficult to ascertain that fact.

- S.P. was sent a letter dated 12 September 2001. Her termination for violation of Article 4.6 of the CBA was effective 26 July 2001 "(three days after Fortis paid compensation)". Dyncorp sent her a certified letter demanding medical documentation but received nothing in response.

(Doc. # 20, Johnson Dep. Exs.., pp. 11, 16, 23, 24, 25).

the court's position by revealing a hint of the greater disparities that likely underlie the individual circumstances of each situation.[17]

While Cannon may or may not need to demonstrate virtually identical circumstances, she certainly must provide facts necessary to determine with relative certainty the degree to which Cannon's circumstances were similar to those of her alleged comparators.  In other words, the light in which a comparator's similarity is to be evaluated must be provided by the plaintiff.  Cannon has failed to do so in this case and has consequently failed to establish a *prima facie* case of discrimination.[18]

A recent Eleventh Circuit case suggests that the inquiry does not end there, however.  ***Wilson***, 376 F.3d at 1091-92 (stating that the plaintiff's "failure to identify a comparator does not end the analysis of her termination claim").  "*If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.*"  ***Holifield***, 115 F.3d at 1562 (emphasis in original) *quoted in **Wilson***, 376 F.3d at 1092.

---

[17]The type of information necessary to establish similarity in this case would include a comparator's work records and, specifically, records establishing a history of absenteeism; exactly how many scheduled workdays were missed; the underlying reason for the absences; the efforts, if any, that the comparator undertook to keep the employer informed of the comparator's status; whether the comparator had applied for short term disability; and, perhaps most importantly for the purpose of this particular case, whether and how the absences were related to use of controlled substances.

[18]The court emphasizes that it does not conclude that Cannon was not similarly situated with her alleged comparators but that she failed to provide evidence from which the court could make that determination.  While material factual disputes will preclude summary judgment, the disputes must materialize from *evidence,* not speculation or conjecture.

Cannon attempts to rely on two alleged facts that, for analytical purposes, the court assumes she can prove:

- She did not violate the rules used by the defendants as the bases for the termination.

- Dyncorp allegedly deviated from a general policy of providing certified letters to absent employees, allowing them 10 days to respond with medical documentation excusing their absence.

Cannon's argument with respect to the alleged work rule violations mirror the defendants' argument that Cannon was not meeting her employer's expectations. It would be disingenuous to forego examination of the defendants' arguments and evidence that Cannon was not meeting her employer's legitimate expectations and, yet, allow Cannon to survive the *prima facie* analysis by providing evidence that she did not violate any rules and was thus meeting her employer's expectations. Cannon cannot have it both ways. As the court has already held, whether Cannon actually violated the work rules goes to the issue of pretext. *See Wilson*, 376 F.3d at 1092 (refusing to address the plaintiff's claims that she did not commit the alleged work rule violations); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 n.1 (11th Cir. 1991) (relegating the "work rule" principle to the pretext stage of the *McDonnell Douglas* framework).

As to Cannon's argument, a nondiscriminatory deviation from a general policy cannot create an inference of discrimination. Therefore, even if Cannon could demonstrate that Dyncorp deviated from its alleged general policy, unless she provides evidence that the

deviation was the result of racial animus, she still fails to state a *prima facie* case of discrimination. ***Mitchell v. USBI Co.***, 186 F.3d 1352, 1355-56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus."); ***Wilson***, 376 F.3d at 1092.

Cannon relies solely on her comparator evidence to establish race as a factor in the defendants' decisions. As the court has already held, this evidence raises no inference of discrimination. Furthermore, Dyncorp did not send certified letters to two of the five alleged comparators and did not allow them 10 days to respond with medical evidence. (Doc. # 20, Johnson Dep. Exs., pp. 16, 24).

One other significant lapse in the evidence compels the court's conclusions: Cannon has presented no evidence of the comparators' work histories, specifically whether any of them had prior terminations. The evidence is undisputed that Dyncorp had terminated Cannon on two previous occasions, and this evidence raises at least an inference of prior acts of misconduct. That Cannon was reinstated pursuant to union procedures does not necessarily negate that inference. It is thus fair and reasonable to conclude that, when Cannon was terminated on 14 February 2002, she was already on notice to comply strictly with the her employer's rules, and she knew - or should have known - that her employment security was at least compromised. Thus, if any inference can be drawn, it is that the application of the alleged general policy depended upon circumstances that were not

determined by an employee's race.[19]

Cannon has failed to present evidence sufficient to raise an inference of discriminatory disparate treatment and has therefore failed to state a *prima facie* case.  Summary judgment is therefore due on her federal discharge claims.


**B.      Retaliation**

Cannon argues that the defendants retaliated against her for formally and informally complaining that Dyncorp was discriminating against her.  (Doc. # 19, Pl's. Br., pp. 37-42). Defendants argue that her most recent complaint before her termination was too remote to be deemed "related" to her termination and that, in any event, the decision maker (Johnson) was unaware that Cannon had ever complained of discrimination.  Evidence in this case that Johnson *was* aware of Cannon's previous complaints suggest that the defendants have abandoned the latter argument, and the court will assume that Johnson was aware of Cannon's complaints. (Docs. # 16, 37).

Title VII makes it unlawful for employers to "discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this [statute], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [statute]."  **42 U.S.C.A. § 2000e-3(a)**

---

[19]Notably, to establish Dyncorp's alleged policy, Cannon relies only upon Johnson's deposition testimony, the context of which indicates that the policy applied only with respect to employees claiming disability.  (Doc. # 20, Johnson Dep., pp. 25-36).  Cannon did not apply for disability for two to three weeks after being released from the hospital.  (Defs'. Ex. 2, p. 87, ll. 3-9, p. 235, ll. 6-17).

**(2004)**.  A plaintiff lacking direct evidence of retaliation must first present a *prima facie* case with evidence establishing that "she engaged in statutorily protected expression; . . . that she suffered an adverse employment action; and . . . that there is some causal relation between the two events."  **Cooper**, 390 F.3d at 740.

Cannon has presented no direct evidence of discrimination.  In addition to several general, self-serving and unsupported statements in her affidavit,[20]  Cannon relies only on the following evidence to support her claims that she "openly spoke out against the discriminatory treatment that she was subjected to, up until [sic] and including the day she was fired" (Doc. # 19, Pl's. Br., p. 40):

- Affidavit testimony that in 1993, she complained to "Dave Courier and other supervisors at Dyncorp about white employees receiving better work assignments and about white employees being granted leave on a less stringent basis than black employees" (Doc. # 19, Cannon Aff., ¶ 4); that she had made

---

[20]The court gives no weight to the following assertions, which lack specificity as well as supporting evidence and constitute legal conclusions rather than factual statements:

- conclusory statements that she "began to complain about discrimination" and "she continued to complain about . . . discriminatory treatment" (Doc. # 19, Cannon Aff., ¶ 5, 6);

- the vague statement that "[t]hroughout the years [she] filed as many as fifteen (15) or twenty (20) internal discrimination charges pointing out that I was being discriminated against based on my race and my sex" (Doc. # 19, Cannon Aff., ¶ 8);

- "Dyncorp continued to discriminate against me through 1998 and I continued to speak out against the discrimination" (Doc. # 19, Cannon Aff., ¶ 9);

- Cannon's affidavit statement that after being rehired in 1999 "[she] continued to complain that [she] was being treated differently than the white employees and the male employees." (Doc. # 19, Cannon Aff., ¶ 11).

21

a written internal complaint approximately two months before she was first terminated in December 1998 (Doc. # 19, Cannon Aff., ¶ 9); that she filed an EEOC charge in 1999 (Doc. # 19, Cannon Aff., ¶ 10; Doc. # 42, ¶ 41) ;

- A notation in an unsigned memo, whose author is unknown, that appears to have been prepared for Cannon's post-termination grievance proceedings and states, "She was disciplined time after time for her poor quality and quantity of work and absenteeism.   Her defense was always harassment and discrimination."  (Doc. # 20, Johnson Dep. Exs., p. 4);

- A statement Johnson made in a 17 September 1998 memorandum for the record, noting that "[w]hen Ms. Cannon received discipline, she claimed that she was being singled out and discriminated against."  (Doc. # 21, Johnson Dep. Exs.);

- Cannon's statement in an accident report dated 22 June 1998 that noted that her "headaches, depression, anxiety, stress and pain" were caused by the fact that she was "not treated fairly, not treated as equal to other employees" and that her "supervisor displayed favortism [sic] amoung [sic] employees". (Doc. # 21, Johnson Dep. Exs., p. 2).

Therefore, based on the evidence she provided, Cannon's last alleged complaint, in relation to which she has stated any verifiable facts, was made in 1999 when she filed her EEOC

charge.[21]

For purposes of analyzing a retaliation claim, the court must assess (1) the nature of the complaint, (2) the date(s) upon which it was made, (3) the persons to whom it was made, (4) the persons who knew   - or should have known -  about the complaint, (5) the adverse action taken against the employee, (6) the date(s) of the adverse action, and (7) the circumstances which indicate   - or at least suggest -   that the action was taken because of the complaint.   The evidence tendered by Cannon on her retaliation claim is woefully insubstantial as a basis for the conclusion that she urges.   Indeed, some of the evidence actually supports the opposite conclusion.   For example, evidence that Cannon "was disciplined time after time for her poor quality and quantity of work and absenteeism" does not aid her argument. (See Doc. # 20, Johnson Dep. Exs., p. 4).

Cannon's case is void of evidence from which a reasonable fact finder could conclude that her 2002 termination was cause by, or related to, her previous complaints of discrimination.   Thus, summary judgment is due to be granted on the retaliation claim as well.

## C.   *Breach of Contract*

The nature of Cannon's breach of contract claim is not clear.   In her opposition to the motion, she asserts that her claim is based on the IAMAW's "refusal to file a grievance on

---

[21]Cannon's claim that the facts indicate a pattern of retaliation is entirely without merit.

the defendant['s] refusal to put the plaintiff back to work even though the plaintiff passed a drug test by November 4, 2002." (Doc. # 19, Pl's. Br., p. 43).[22]  However, her complaint specifically alleges only that Dyncorp breached the CBA by firing her without just cause. (Doc. # 1, ¶. 41).  Regardless of which theory Cannon intended to advance, the outcome is the same.  Her contract claim is time barred.[23]

As the parties are aware, the Supreme Court, in ***DelCostello v. Int'l Brotherhood of Teamsters***, 462 U.S. 151 (1983), held that the time limitation set forth in section 10(b) of the National Labor Relations Act, **29 U.S.C. § 160(b)**, governs employee claims against either an employer or union for breach of a CBA. *Id.* at 155. (Doc. # 16, p. 28; Doc. # 19, Pl's. Br., p. 42).   Accordingly, "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the [complaint] . . ., unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces." **§ 160(b)**.

According to the Eleventh Circuit, the six-month period begins to run on

> "the date [she] knew or should have known of the Union's final action or the [employer's] final action, whichever is later." ***Adams v. United Paperworkers Int'l***, 189 F.3d 1321, 1322

---

[22]Cannon apparently understands the arbitrator's opinion to mean that she could have submitted as many urine samples as nature would allow before 4 November. (Doc. # 19, Pl's. Br., pp. 10-11).  By her reasoning, any one negative result out of 20 positive results would have required her reinstatement.

[23]Cannon does not specify whether her breach of contract claim is governed by state or federal law. (Doc. # 1).  She also does not dispute the defendants' assertion that her claim is governed by federal law. (Doc. # 19, Pl's. Br., pp. 42-44;  Doc. # 16, pp. 25-26).  It is well settled that a contract claim arising out of, and, thus, depending upon the meaning of, a CBA is governed by federal law.  **29 U.S.C. § 185(a) (2004)**; *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403-406 (1988);  *Bartholomew v. AGL Resources, Inc.*, 361 F.3d 1333, 1338 (11th Cir. 2004).  In any case, federal law which addresses the precise issue under consideration is entitled to supremacy.

(11th Cir. 1999). The "final action" is the point at which 'the grievance procedure was exhausted or otherwise [broken] down to the employee's disadvantage." ***Proudfoot v. Seafarer's Int'l Union***, 779 F.2d 1558, 1559 (11th Cir. 1986) (citing ***Howard v. Lockheed-Georgia Co.***, 742 F.2d 612 (11th Cir. 1984).

***Coppage v. U.S. Postal Service***, 281 F.3d 1200, 1204 (11th Cir. 2002).

Cannon stated at her deposition that she took the lab report from the second drug test to Dyncorp by 4 November 2002. (Doc. # 19, Cannon Aff., ¶ 25). She further testified that she brought the results to the union "the same day [she] picked it up." (Defs'. Ex. 2, p. 137, ll. 4-15). At that time, "[t]he union said that the company wasn't going to accept it and that they were not going to file a grievance or do anything . . .. So the union wouldn't do anything either." (Defs'. Ex. 2, p. 137, ll. 4-15). Nothing further was done. Therefore, the final action took place on or about 4 November 2002. Cannon did not file this lawsuit until March 2004, approximately seventeen months later. Therefore, summary judgment is due to be granted with respect to her breach of contract claim. [24]

**D.      *State Law Invasion of Privacy Claims***

Having disposed of all claims over which the court has original jurisdiction and

---

[24]Cannon cites to Fed. R. Civ. P. 8(c) and argues, ironically, that the defendants waived the statute of limitations defense because, even though they pled it as their ninth affirmative defense, they did not specify exactly which of her four claims was time barred. (Doc. # 19, Pl's. Br., p. 44 n.5). She points to no cases requiring such specificity, however, and simply suggests that the blanket defense provided insufficient notice. Assuming without deciding that the defendant's pleading was insufficient, the Eleventh Circuit has stated that "if a plaintiff receives notice of an affirmative defense by some means other than pleadings, 'the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.'" ***Grant v. Preferred Research, Inc.***, 885 F.2d 795, 797 (11th Cir. 1989) (quoting ***Hassan v. U.S. Postal Service***, 842 F.2d 260, 263 (11th Cir. 1988)). With trial more than two months away, the defendants' argument in their summary judgment motion provides sufficient notice. ***Grant***, 885 F.2d at 797-98 (finding no prejudice when the defense was asserted for the first time in a summary judgment motion one month before trial).

pursuant to **28 U.S.C.A. § 1367**, the court declines to exercise supplemental jurisdiction over Cannon's state law claim of invasion of privacy.   The supplemental jurisdiction statute provides, in relevant part:

> (a) Except as provided in subsections (b) and (c) ..., in any civil action of which district courts shall have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.
> . . . . . . . . . .
>
> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
>
>> (1) the claim raises a novel or complex issue of State law,
>>
>> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>>
>> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>>
>> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C.A. § 1367.

Because the defendants are entitled to summary judgment regarding the "claims over which the district court has original jurisdiction", namely the federal claims of race discrimination and retaliation, the court may exercise its discretion, pursuant to subsection (c) (3) above, to decline to exercise supplemental jurisdiction over Cannon's state law claims.

*Palmer v. Hosp. Auth. of Randolph County*, 22 F.3d 1559, 1568 (11th Cir.1994).

Therefore, Cannon's state law claim of invasion of privacy should be dismissed without prejudice.


## IV.  CONCLUSION

For the reasons stated herein, it is ORDERED that:

1.    The Motion for Summary Judgment (Doc. # 15) should be GRANTED with respect to the plaintiff's claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 1981 and 29 U.S.C. § 185(a)

2.    Cannon's claims for invasion of privacy should be DISMISSED without prejudice.

The Clerk of the court is DIRECTED to terminate all motions in this case.

DONE this 20th day of June, 2005.


/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE

27